UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- against -

ROMAN ISRAILOV,
                              Defendant.

**MEMORANDUM
OPINION & ORDER**

22 Cr. 20 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      Defendant Roman Israilov moves to suppress intercepted wire communications

and for a severance.  For the reasons stated below, his motions will be denied.

## BACKGROUND

## I.   THE INDICTMENT

      Israilov is charged in United States v. Gulkarov et al., 22 Cr. 20 (PGG), a multi-

defendant case involving no-fault insurance fraud.  The Indictment alleges that from

approximately 2014 to 2021, Israilov and his co-defendants participated in a scheme to procure

the identity of car accident victims via bribery and steer the victims to corrupt no-fault medical

clinics, which billed insurance companies for unnecessary procedures and falsely represented to

the insurers that they were owned and controlled by physicians, when in fact they were not.

(Indictment (Dkt. No. 1))

      The Government alleges that Israilov was a "Clinic Controller," i.e., one of

> the leaders, organizers, and managers of the Gulkarov Organization and the No-
> Fault Scheme.  The Clinic Controllers – who are not licensed medical
> practitioners – owned, operated, and controlled the No-Fault Clinics that engaged
> in the fraudulent billing for unnecessary and excessive medical treatment under
> the No-Fault Law.  The Clinic Controllers also engaged in multiple types of
> money laundering to conceal the proceeds of those crimes and financed a
> widespread bribery and kickback scheme to bring patients into the Clinics.

(Id. ¶ 8)

Israilov is charged in Count One of the Indictment with conspiracy to commit healthcare fraud, in violation of 18 U.S.C. §§ 1347 and 1349, between 2014 and 2021; in Count Two with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), between 2014 and 2021; and in Count Three with conspiracy to commit Travel Act bribery, in violation of 18 U.S.C. § 1952, between 2015 and 2019.  (Id., passim)

The Indictment alleges that Israilov and the other Clinic Controllers (1) paid bribes to steer patients to no-fault clinics; (2) fraudulently operated the no-fault clinics; (3) laundered the clinics' fraudulent proceeds; and (4) obstructed the Government's investigation.

As to bribery, the Indictment alleges that "[t]he Clinic Controllers arranged for [co-conspirators referred to as 'Runners'] to pay hundreds of thousands of dollars to . . . lead sources (i.e., employees or agents of hospitals, medical service providers, police officers and 911 operators employed by the [New York City Police Department], and other entities)" in exchange for the names and contact information of "motor vehicle accident victims in New York, New Jersey, and elsewhere."  (Id. ¶ 27)  The Runners then cold-called these victims, falsely representing that they were "calling on behalf of the New York State Department of Transportation."  The Runners urged the accident victims to seek treatment at the no-fault clinics that the Clinic Controllers, including Israilov, owned and operated.  (Id. ¶ 28)  "The Clinic Controllers paid the Runners approximately $1,500 to $3,000 per successful 'referral.'"  (Id. ¶ 29)

As to the no-fault clinics, the Indictment alleges that "[t]he Clinic Controllers" – although not licensed physicians – "were the actual owners, operat[ors], and controllers of [the] Clinics," and controlled the clinics' finances and treatment decisions.  (Id. ¶ 15)  According to the Indictment, the Clinic Controllers directed which procedures and medications the physicians

associated with the clinics would prescribe, including procedures and treatments that were medically unnecessary, thus leading to overbilling of insurers.  The Clinic Controllers also arranged for the physicians associated with the clinics to falsely represent to insurers that the clinics were physician-owned and -operated, in order to obtain payment of assigned insurance claims that would otherwise be denied.  (Id. ¶¶ 15-20)

As to money laundering, the Indictment alleges that "[t]he Clinic Controllers required the No-Fault Physicians to pay fees to companies that the Clinic Controllers owned and controlled.  The Clinic[] Controllers used these fees – such as 'marketing,' 'billing,' and 'rent' – to make their relationship with the No-Fault Clinics appear legitimate.  In reality, the fees were nonnegotiable, illegal, and excessive."  (Id. ¶ 24)  The Clinic Controllers also used debit cards, credit cards, and pre-signed checks from the no-fault clinics to pay for personal expenses such as real estate, travel, and luxury goods.  They disguised these payments by first transferring the clinics' money to either (1) the bank accounts of shell companies they controlled, from which they then withdrew cash; or (2) the law firm of Defendant Wisnicki, an attorney, who then "paid family members of the Clinic Controllers or purchased real estate on behalf of family members of the Clinic Controllers."  (Id. ¶¶ 23-25)

As to obstruction, the Indictment alleges that in 2021, after Wisnicki's law firm was served with a grand jury subpoena, Defendants Gulkarov, DiPietro, and Wisnicki attempted to obstruct the Government's investigation into the no-fault scheme through, inter alia, false testimony to the grand jury and creation of phony retainer agreements to explain payments.  The Indictment also alleges that Defendant Aronov made false statements to law enforcement.  The factual allegations of obstruction appear in the "means and methods" section of the healthcare fraud conspiracy count, in which Israilov is charged.  (Id. ¶¶ 31-39)

II.    **PROCEDURAL HISTORY**

The Indictment was filed on January 11, 2022.  (Dkt. No. 1)

Israilov moved to suppress and for a severance on October 19, 2022.  (Dkt. No. 148)  This Court heard oral argument on April 25, 2023 (Apr. 25, 2023 Tr. (Dkt. No. 221)), and the parties later filed post-hearing briefs.  (Dkt. Nos. 227, 236, 240)

## DISCUSSION

I.    **ISRAILOV'S MOTION TO SUPPRESS THE WIRETAP EVIDENCE**

Israilov moves to "suppress all wire communications in which [he] was intercepted and all evidence derived therefrom." [1]  He contends that "electronic surveillance of [Defendant Peter] Khaimov's telephones" – on which Israilov was intercepted – was "wrongly authorized," because "the affidavits in support of the [February 3, 2017] application [for electronic surveillance of Khaimov's telephones] failed to adequately demonstrate that alternative investigatory methods would have been unsuccessful or unlikely to succeed." (Israilov Br. (Dkt. No. 149) at 9 (capitalization altered)) [2]

A.    **Factual Background**

The Khaimov wiretap was issued in connection with a years-long investigation into a sprawling network of no-fault insurance fraud schemes in New York and New Jersey.  The investigation culminated in three multi-defendant no-fault insurance fraud cases before this Court:  United States v. Rose, 19 Cr. 789; United States v. Pierre, 22 Cr. 19; and the instant case.

---

[1]  Defendant Gulkarov has joined Israilov's motion to suppress.  (See Nov. 1, 2022 Gulkarov Ltr. (Dkt. No. 156); Nov. 10, 2022 Order (Dkt. No. 164))

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

As part of the investigation, law enforcement obtained court-authorized wiretaps regarding numerous targets suspected of no-fault insurance fraud and related crimes.  Khaimov was one of the individuals whose phones were wiretapped.  In an earlier opinion, this Court set forth the background of the investigation:

> The investigation of the Defendants' fraudulent scheme was initially pursued by the Westchester County District Attorney's Office (the "D.A.") and the New York State Police.  The investigation began in 2013 with a focus on staged accidents. The target of the initial wiretap application in June 2016 was Robert Garris, who allegedly was recruiting "victims" and steering them to a particular medical clinic located at 2 Wilson Place in Mount Vernon, New York.  The clinic – which was operated by . . . Nathaniel Coles[, a defendant in Rose] – paid kickbacks for the referrals.
>
> . . . .
>
> The initial wiretap was authorized [in June 2016] by Justice Warhit of the New York Supreme Court.  In July 2016, Justice Warhit authorized an extension of the Garris wiretap and a new wiretap on Coles' phone based on affidavits demonstrating both that Garris and Coles were using the subject telephones to engage in insurance fraud and that traditional investigative techniques – while still being utilized by investigators – remained inadequate to discover the full scope of the criminal activity and to identify all of those participating in it.
>
> . . . .
>
> On September 16, 2016, the D.A. obtained a wiretap on what investigators later learned was lead [Rose] Defendant Anthony Rose's phone.

United States v. Rose, No. 19 CR. 789 (PGG), 2021 WL 2117119, at *2-3 (S.D.N.Y. May 24, 2021) (citations omitted).

Between October 2016 and January 2017, investigators obtained court-authorized wiretaps on the phones of suspected no-fault fraud conspirators Wilhelmina Fuller, Gikor "George" Sonayan, Vladimir Kutsyk, and Ilya Sholomov.  (Cecchini Aff. (Dkt. No. 149-1) ¶¶ 9, 11, 13)  Throughout this period, investigators also periodically obtained orders granting extensions of previously issued wiretaps.  (Id. ¶¶ 9-14)

On February 3, 2017, investigators applied for wiretaps on two of Khaimov's phones.  The application is supported by affidavits from Assistant District Attorney ("A.D.A.") Craig Cecchini and New York State Police Investigator Paul Schneeloch.  Cecchini's affidavit is 70 pages, while Schneeloch's affidavit is 112 pages.  (Cecchini Aff. (Dkt. No. 149-1); Schneeloch Aff. (Dkt. No. 149-2))

In A.D.A. Cecchini's affidavit, he asserts that Khaimov is using the phones at issue to conduct communications in furtherance of a no-fault insurance fraud scheme.  (Dkt. No. 149-1 ¶ 26(e)-(f))  In the Schneeloch affidavit, Investigator Schneeloch provides examples of these communications, including intercepted calls between Khaimov and Rose about (1) a "new [patient referral] arrangement [among] Rose, . . . [lead Defendant] Alex [Gulkarov], and Peter [Khaimov]"; (2) a potential "relationship" between Khaimov and Rose Defendant Jelani Wray involving "post-operative medical supplies"; (3) the availability of a "stand-up MRI" at Khaimov's clinics; (4) a "business opportunity" that Khaimov pitched to Rose; and (5) setting up a meeting among Rose, Gulkarov, and Khaimov.  (Schneeloch Aff. (Dkt. No. 149-2) ¶¶ 119-25)

As to the need for electronic surveillance, Cecchini's affidavit acknowledges the progress that investigators using "traditional investigative techniques" had made "toward[s] establishing the nature and scope of the medical mill criminal enterprise."  (Cecchini Aff. (Dkt. No. 149-1) ¶ 35)  Cecchini states, however, that "the nature of [the] crimes committed by the medical mill criminal enterprise necessitates an agreement between the parties involved in the conspiracy, which the continued eavesdropping of the above-captioned cellular phones[, including Khaimov's,] will provide."  (Id. ¶ 28)  Cecchini then provides an overview of how video surveillance, physical surveillance, GPS surveillance, analysis of telephone records, cooperation agreements with a confidential informant and a confidential source, potential arrests

of conspirators, use of an undercover officer, use of the grand jury, and search warrants either are not feasible or are not sufficient to achieve all the objectives of the investigation.  (Id. ¶¶ 36-97)

In a section of the affidavit concerning confidential informants, A.D.A. Cecchini discusses Dr. Andre Duhamel.  Cecchini states that Duhamel has been working as a State Police informant since December 2016.  At the time of the affidavit, Dr. Duhamel was working one day a week at a clinic operated by Gikor "George" Sonayan, a participant in the no-fault insurance fraud scheme.  Cecchini reports that Khaimov referred Duhamel to work at a clinic owned by Rose defendant Nathaniel Coles.  Duhamel opened a bank account and obtained a checkbook for the clinic while working for Coles, but was later fired by Coles.  Cecchini states that

> [a]lthough Dr. Duhamel may be able to provide historical information regarding Coles and the 2 Wilson Place clinic, at this stage, Duhamel no longer has any contact with Coles and due to being fired, any future contact does not appear realistic either.  Thus, Duhamel would be of little use in building a case against Coles or other members of the 2 Wilson Place clinic.

> Through my conversations with Inv. Schneeloch, who has been communicating with Duhamel on a regular basis, Duhamel has not indicated any knowledge regarding Anthony Rose [Sr.] or his New York/New Jersey operations.

> Thus, due to his working one day per week at a clinic operated by Gikor Sonayan a/k/a George, Duhamel may learn limited information regarding the operation of the clinic, such as matters that pertain to the "treatment of patients" only.

> The fact that Duhamel has the ability to communicate with Khaimov and Alex Gulkarov, while helpful, does not have the potential to generate a significant amount of evidence against others, especially Rose and his out of state networks. This is especially true in light of the fact that Khaimov has recently refused to meet with Duhamel.

> While important and perhaps exposing portions of the fraudulent schemes, other matters such as any agreements related to the referral and assignments of patients between clinic managers and attorneys, the identity of the owners, and any money laundering schemes between these actors in order to distribute the proceeds of these crimes may not become known solely through the use of Duhamel as a confidential informant.

> Therefore, Duhamel's cooperation, if any, will only be a piece of this investigation and his cooperation will not accomplish all of the goals that will lead to a successful

conclusion of this case.  However, in furtherance of the investigation, we will
continue to use Duhamel and look to develop other confidential informants.

(Id. ¶¶ 68-74)

In Schneeloch's affidavit, he provides more details about Duhamel.  He explains
that Duhamel opened a clinic for Coles, who made regular payments to Duhamel for a time.
Coles later concluded that Duhamel was not working enough days at the clinic to justify his
compensation, and asked Duhamel to refund a portion of what he had been paid.  Duhamel
refused, and Coles then told him, "get your shit and get out."  When Duhamel left the clinic, he
took clinic checkbooks and bank cards in his name.  (Schneeloch Aff. (Dkt. No. 149-2) ¶¶ 129-
31)  In an intercepted call, Coles reported to Khaimov that he had "kicked [Duhamel's] ass out,"
and that Duhamel was "play[ing] stupid."  (Id. ¶ 136)  At the direction of law enforcement,
Duhamel attempted to schedule a meeting with Khaimov to return the clinic checkbooks and
bank cards, so that Khaimov could give these materials to Coles.  Khaimov did not appear for the
agreed-upon meeting, however, and refused to take custody of the clinic checkbooks and bank
cards.  Schneeloch inferred that Khaimov did not want to be seen collecting the clinic
checkbooks and bank cards from Duhamel.  (Id. ¶¶ 139-47)

Schneeloch also summarizes another intercepted phone call between Coles and
Khaimov in which Coles complains that Duhamel "screw[ed] [him]," and schedules a follow-up
meeting with Khaimov to discuss Duhamel.  During this call, Khaimov refers to Duhamel as a
"fucking douch[e]bag."  (Id. ¶ 148)

On the basis of the Cecchini and Schneeloch affidavits, Justice Warhit concluded
that there was probable cause to believe that Khaimov was using two of his phones to conduct
communications in furtherance of the alleged no-fault insurance fraud scheme.  Accordingly,

Justice Warhit issued a February 3, 2017 order authorizing the interception of communications over these phones.  (Feb. 3, 2017 Wiretap Order (Dkt. No. 149-3) at 3, 6-7, 12-14)

According to Israilov, as a result of "the February 3, 2017 wiretap authorization, investigators captured the content of communications between Mr. Khaimov and Mr. Israilov." (Israilov Br. (Dkt. No. 149) at 9)

**B.**     **Legal Standards**

Before authorizing the interception of electronic communications pursuant to Title III or New York law,[3] a court must find that

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a [crime enumerated in 18 U.S.C. § 2516];
>
> (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
>
> (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and]
>
> (d) . . . there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense . . . .

18 U.S.C. § 2518(3).

The statutory requirement that "normal" investigative techniques be addressed in wiretap applications is "'designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"  United States v. Serrano, 450 F. Supp. 2d 227, 236 (S.D.N.Y. 2006) (quoting United States v. Kahn, 415 U.S.

---

[3] "For practical purposes the federal and New York statutory requirements [for wiretap orders] are the same."  United States v. Lilla, 699 F.2d 99, 102 (2d Cir. 1983).

143, 153 n.12 (1974)).  The legislative history accompanying Section 2518 indicates that

"normal investigative techniques" include, <u>inter alia</u>,

> standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants.

S. REP. NO. 90-1097 (1968), <u>reprinted in</u> 1968 U.S.C.C.A.N. 2112, 2190.

Courts must take a "commonsense approach" to the necessity requirement.

<u>United States v. Concepcion</u>, 579 F.3d 214, 218 (2d Cir. 2009).  Although "generalized and

conclusory statements that other investigative procedures would prove unsuccessful" do not

suffice, "the Government is not required to exhaust all conceivable investigative techniques

before resorting to electronic surveillance."  <u>Id.</u> (internal quotation marks and citation omitted);

<u>see also</u> <u>United States v. Trippe</u>, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("While generalized

or conclusory statements in an application are insufficient to support a showing of necessity, the

application must be viewed in a practical and common sense manner and need be only minimally

adequate to support the issuing judge's determination of necessity.") (internal citation omitted).

"'The statute only requires that the agents inform the authorizing judicial officer

of the nature and progress of the investigation and of the difficulties inherent in the use of normal

law enforcement methods.'"  <u>Concepcion</u>, 579 F.3d at 218 (quoting <u>United States v. Diaz</u>, 176

F.3d 52, 111 (2d Cir. 1999)).  There is no requirement "'that any particular investigative

procedures . . . be exhausted before a wiretap may be authorized.'"  <u>United States v. Miller</u>, 116

F.3d 641, 663 (2d Cir. 1997) (quoting <u>United States v. Young</u>, 822 F.2d 1234, 1237 (2d Cir.

1987)).  "[A] reasoned explanation, grounded in the facts of the case, and which squares with

common sense, is all that is required."  <u>United States v. Scala</u>, 388 F. Supp. 2d 396, 404

(S.D.N.Y. 2005) (internal quotation marks and citations omitted).

"The issuing judge's determination that the Government has made adequate use of alternative investigatory techniques is entitled to substantial deference." Trippe, 171 F. Supp. 2d at 236 (citing United States v. Wilkinson, 754 F.2d 1427, 1433 (2d Cir. 1985)).

The Second Circuit has noted that "'wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.'" United States v. Fleishman, No. 11 Cr. 32(JSR), 2011 WL 4000987, at *3 (S.D.N.Y. Aug. 31, 2011) (quoting United States v. Steinberg, 525 F.2d 1126, 1130 (2d Cir. 1975)); see also Steinberg, 525 F.2d at 1131 ("[T]he very scope of the operations described in the affidavit made it highly likely that numerous narcotics-related communications would take place in the future."). And where – as here – a far-flung conspiracy is at work, the need for a wiretap may be compelling: "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." United States v. Feola, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).

Defendants bear the burden of demonstrating that a wiretap application is deficient. United States v. Fea, No. 10 Cr. 708(PKC), 2011 WL 1346981, at *4 (S.D.N.Y. Apr. 5, 2011) (citing United States v. Magiddino, 496 F.2d 455, 459-60 (2d Cir. 1974) ("[T]he burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed.") (internal quotation marks and citation omitted)).

**C.    Analysis**

Israilov argues that "[t]he state prosecutors' affidavits submitted in support of the February 3, 2017 eavesdropping application failed to explain adequately why the continued use of confidential sources would have been unsuccessful in achieving the goals of the investigation of Mr. Khaimov":

The Schneeloch Affidavit contained no statements evaluating the past use of confidential sources or whether continued employment of these resources was unlikely to continue to succeed.  While the Cecchini Affidavit addressed these issues, it failed to make the requisite showing with respect to the request to place new wiretaps on the Khaimov phones. . . . While the prosecutor described [Duhamel] as having diminishing utility with respect to earlier targets, [Duhamel]'s relationship with Mr. Khaimov remained stable. . . . The Cecchini Affidavit actually was . . . ebullient about the utility of this cooperator, whose ability to communicate with Khaimov was deemed "helpful" and "important" to the investigation.  A.D.A. Cecchini never explained why this "helpful" and "important" investigative technique was not likely to be successful in the case of continued investigation of Khaimov.

(Israilov Br. (Dkt. No. 149) at 13-14)  Israilov goes on to argue that – because Duhamel remained available to "further [the] investigation of Khaimov" – "no necessity existed in February 2017 to impose the extraordinary tool of an electronic intercept on Khaimov's phones." (Id. at 15)

Israilov's motion to suppress thus rests entirely on the argument that – because of Duhamel's cooperation – the affidavits submitted in support of the February 3, 2017 wiretap application regarding Khaimov's phones do not adequately demonstrate the necessity of a wiretap.

In Rose, defendant Leon Blue likewise argued that the investigators had not adequately demonstrated – in the series of wiretap applications and extension requests discussed above – that wiretaps on the phones of, among others, Rose defendants Rose and Coles were necessary.  Blue – like Israilov – argued that Duhamel's status as a cooperator rendered the wiretaps unnecessary:

Blue contends that the Government acted improperly in obtaining wiretap authorizations during the period between December 2016 and March 2017, because "[a]t no point during the ten months of interception did [the investigators] ever go down and attempt traditional investigative techniques; instead, they kept informing the magistrate that they had yet to reach the unreachable star of perfect information. . . ."  (Blue Br. (Dkt. No. 321) at 12)  As discussed above, however, law enforcement's obligation is to explain what use it has made of traditional investigative techniques, and why the traditional investigative techniques have

proven inadequate to accomplish all the goals of the investigation.  The . . .
wiretap applications [at issue] meet this standard.

. . . .

[I]n his December 8, 2016 affidavit, A.D.A. Cecchini discloses that investigators
had obtained a confidential informant [– Duhamel –] in October 2016, but that the
informant had recently been fired from the 2 Wilson Place medical clinic.  (See
Dec. 8, 2016 Cecchini Aff. ¶¶ 59-60) ("[The confidential informant] provided
some information on how the 2 Wilson Place clinic operated[,] [but] [t]his Friday,
. . . [the confidential informant] informed [an investigator] that Coles terminated
his services that day. . . . [S]ince he has been fired from the 2 Wilson Place clinic,
the information that he can provide . . . [and] his usefulness from a proactive
standpoint, is likely limited."); see also Feb. 3, 2017 Cecchini Aff. ¶¶ 69-70
("[A]t this stage, [confidential informant Duhamel] no longer has any contact with
Coles and . . . any future contact does not appear realistic either. . . . [Duhamel]
has not indicated any knowledge regarding Anthony Rose Jr. or his New
York/New Jersey operations. . . ."))

. . . .

In sum, the investigators provided a "reasoned explanation" as to why "normal
investigative procedures have been tried and failed or reasonably appear to be
unlikely to succeed or to be too dangerous[,]" which "is all that is required."
Scala, 388 F. Supp. 2d at 403-04 (internal quotation marks and citations omitted).
Accordingly, Defendant Blue's motion to suppress the wiretap evidence will be
denied.

Rose, 2021 WL 2117119, at *8-9.

Nothing in Israilov's brief suggests that a different outcome is appropriate here.

As an initial matter, and contrary to Israilov's assertion, the necessity inquiry does

not turn on whether Duhamel "would be unsuccessful or unlikely to succeed with respect to

obtaining information about Mr. Khaimov, his communications related to possible crimes, and

the relationships he had."  (Israilov Br. (Dkt. No. 149) at 13; see id. at 14 ("Nothing in Mr.

Schneeloch's affidavit indicated that this other cooperator's relationship with Mr. Khaimov had

run its course or would be unproductive."); id. at 14-15 (discussing Duhamel's utility as a

cooperator vis à vis Khaimov)).  The Government is not "required to demonstrate that traditional

investigative techniques are inadequate as to each and every investigative goal and as to each and

every target subject." Rose, 2021 WL 2117119, at *8. Instead, the reviewing judge – in considering whether necessity had been demonstrated – could consider whether Duhamel's cooperation was likely to permit the Government to identify the leadership, means, and methods of the Rose organization, which was the investigative goal of the wiretap. See Miller, 116 F.3d at 664 (finding that wiretap order was properly issued, despite availability of cooperator, when, "[u]sing normal techniques, the State had been unable to penetrate the [criminal organization under investigation] or gain sufficient admissible evidence against any members other than those at the lowest echelons"). And Israilov "'cite[s] no law suggesting that the Government is required – in connection with the necessity requirement – to make an individualized presentation as to each target subject and the efficacy of each potential investigative tool as to that target.'" Rose, 2021 WL 2117119, at *8 (quoting United States v. Kazarian, No. 10 Cr. 895(PGG), 2012 WL 1810214, at *11 (S.D.N.Y. May 18, 2012)).

And while Israilov contends that the February 3, 2017 wiretap application is "ebullient about [Duhamel's] utility [as a] cooperator" (Israilov Br. (Dkt. No. 149) at 14), that is a mischaracterization of the Cecchini and Schneeloch affidavits, both of which highlight the limitations on Duhamel's utility as a cooperator, particularly as to the complex and far-flung Rose conspiracy:

- "Although Dr. Duhamel may be able to provide historical information regarding Coles and the 2 Wilson Place clinic, at this stage, Duhamel no longer has any contact with Coles and due to being fired, any future contact does not appear realistic either. Thus, Duhamel would be of little use in building a case against Coles or other members of the 2 Wilson Place clinic."

- "Through my conversations with Inv. Schneeloch, who has been communicating with Duhamel on a regular basis, Duhamel has not indicated any knowledge regarding Anthony Rose [Sr.] or his New York/New Jersey operations."

- "While important and perhaps exposing portions of the fraudulent schemes, other matters such as any agreements related to the referral and assignments of patients between clinic managers and attorneys, the identity of the owners, and any money laundering schemes

between these actors in order to distribute the proceeds of these crimes may not become known solely through the use of Duhamel as a confidential informant."

- "Therefore, Duhamel's cooperation, if any, will only be a piece of this investigation and his cooperation will not accomplish all of the goals that will lead to a successful conclusion of this case.  However, in furtherance of the investigation, we will continue to use Duhamel and look to develop other confidential informants."

- Khaimov refused to meet with Duhamel to collect the checkbooks and bank cards Duhamel had taken from Coles' clinic.

- Coles denigrated Duhamel in a phone call with Khaimov and scheduled an in-person conversation to discuss Duhamel further.  Khaimov also insulted Duhamel during that call.

(Cecchini Aff. (Dkt. No. 149-1) ¶¶ 69-70, 73-74; Schneeloch Aff. (Dkt. No. 149-2) ¶¶ 144-48)

Bearing in mind the "substantial deference" to which "[t]he issuing judge's determination . . . is entitled," Trippe, 171 F. Supp. 2d at 236, the affidavits' descriptions of Duhamel's cooperation – and the limitations on his utility as a cooperator – easily constitute a "reasoned explanation" as to why "normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed."  Scala, 388 F. Supp. 2d at 403-04 (internal quotation marks and citations omitted); see United States v. Zemlyansky, 945 F. Supp. 2d 438, 483–84 (S.D.N.Y. 2013) (affidavits "adequately supported [the issuing judge's] finding that it was necessary to continue the wiretap despite . . . [existence of] cooperat[or]," where "cooperation had just begun, and it was simply not possible to foresee what fruits, if any, the agreement would yield"; "the [no-fault insurance] scheme being investigated was exceedingly complex, making it unlikely that [the cooperator's] involvement would eviscerate the necessity of the wiretap"; and the "[a]pplication suggested that [the cooperator] might not be involved in every one of [defendant's] allegedly fraudulent clinics, which in and of itself made the continued monitoring [of defendant's] phone appropriate").

In sum, the February 3, 2017 wiretap application was not defective, and the communications intercepted pursuant to the wiretap on Khaimov's phones will not be suppressed.

## II.   SEVERANCE MOTION

Israilov moves for a severance as to Counts Four and Five of the Indictment, which charge conspiracy to obstruct justice and Section 1001 false statements as to co-defendants.  Israilov contends that he will suffer "prejudicial spillover" from the obstruction evidence, which the jury will likely regard as demonstrating consciousness of guilt.  According to Israilov, the jury will not comply with any limiting instruction directing it to consider the obstruction evidence only as against the Defendants charged in Counts Four and Five.  (Israilov Br. (Dkt. No. 149) at 20-21; Israilov Supp. Br. (Dkt. No. 236))

### A.   Factual Background

Count Four of the Indictment charges Defendants Gulkarov, DiPietro, and Wisnicki with conspiracy to obstruct justice, while Count Five charges Defendant Aronov with making false statements to federal agents in violation of 18 U.S.C. § 1001.  In Count Four, the Government alleges that – after Wisnicki's law firm received an April 2021 grand jury subpoena in connection with the alleged no-fault insurance fraud scheme – Gulkarov, DiPietro, and Wisnicki obstructed the Government's investigation:  (1) Defendant Gulkarov instructed physicians to sign backdated retainer agreements with the Wisnicki Firm; (2) Defendant DiPietro facilitated the return of phony retainer fees to Gulkarov by giving a check from the Wisnicki Firm to a physician;[4] and (3) on July 6, 2021, Wisnicki falsely testified to a grand jury that,

---

[4]  Defendant DiPietro allocuted to this conduct during his April 11, 2023 guilty plea.  (Apr. 11, 2023 DiPietro Plea Tr. (Dkt. No. 232) at 24-25)

"among other things . . . payments to the Wisnicki Firm were for the purpose of opening a 'lending platform' that was never completed, that Wisnicki had not spoken to anyone outside of the Wisnicki Firm about the Subpoena, and that Wisnicki's law partner was involved in preparing the retainer  agreements."  (Indictment (Dkt. No. 1) ¶ 54)

        In Count Five of the Indictment, the Government alleges that on November 19, 2021, Defendant Aronov, a New York City Police Department Officer, made false statements to federal law enforcement agents when questioned about taking photographs of confidential motor vehicle accident reports and transmitting them to Defendant Gulkarov.  (Id. ¶¶ 55-56)

        Israilov is not charged in Count Four or Count Five.

**B.**    **Legal Standards**

    **1.**    **Conspiracy**

        The "essence of a conspiracy is 'an agreement to commit an unlawful act.'" United States v. Jimenez Recio, 537 U.S. 270, 274 (2003) (quoting Iannelli v. United States, 420 U.S. 770, 777 (1975))  While "the law does not punish criminal thoughts," in a criminal conspiracy "the criminal agreement itself is the actus reus."  United States v. Shabani, 513 U.S. 10, 16 (1994).

        "Conspiracy requires proof of (1) an agreement among the conspirators to commit an offense; (2) specific intent to achieve the objective of the conspiracy; and (3) usually, [but not always,] an overt act to effect the object of the conspiracy."  United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996).

        "[T]he government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent.'"  United States v. Chavez, 549 F.3d 119, 125 (2d Cir. 2008) (quoting United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008); further quotation omitted), abrogated on other grounds by Dean v. United States, 581 U.S. 62

(2017); accord United States v. Salameh, 152 F.3d 88, 147 (2d Cir. 1998) (government is only required to show that defendant had "'some knowledge of the [conspiracy's] unlawful aims and objectives'") (quoting United States v. Heinemann, 801 F.2d 86, 93 (2d Cir.1986)).  Similarly, under the rule of Pinkerton v. United States, a defendant is vicariously liable for the reasonably foreseeable acts of his co-conspirators that are taken in furtherance of the conspiracy's objectives.  328 U.S. 640 (1946).  "'Whether a particular crime is foreseeable and in furtherance of the conspiracy is a factual matter for the jury.'"  Diaz, 176 F.3d at 99 (quoting United States v. Romero, 897 F.2d 47, 51 (2d Cir. 1990)).

> "Where the object of a conspiracy is economic, the conspiracy generally 'continues until the conspirators receive their anticipated economic benefits.'"  United States v. LaSpina, 299 F.3d 165, 175 (2d Cir. 2002) (quoting United States v. Mennuti, 679 F.2d 1032, 1035 (2d Cir.1982)).  "Thus, efforts to secrete or launder moneys gained from a scheme for monetary gain, and to safeguard them from discovery or recovery, are to be considered acts in furtherance of the conspiracy, rather than mere acts of concealment of the commission of crime."  United States v. Milstein, 401 F.3d 53, 72 (2d Cir. 2005).

2.    **Severance**

Rule 8(b) of the Federal Rules of Criminal Procedure provides that two or more defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Joinder of defendants in multiple-count indictments is proper where the charged conduct is "'unified by some substantial identity of facts or participants' or 'arise[s] out of a common plan or scheme.'"  United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (quoting United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987)); accord United States v. Rittweger, 524 F.3d 171, 178 (2d Cir. 2008).  Joinder may be appropriate even where a defendant is not charged in a conspiracy count that names co-defendants.  Id. (citing United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003)).

The Second Circuit has instructed that joinder is proper when "common factual elements" of different charges are readily apparent.  United States v. Turoff, 853 F.2d 1037, 1044 (2d Cir. 1988).  For example, "counts might be 'connected' if one of the offenses 'depend[s] upon [ ] or necessarily l[leads] to the commission of the other,' or if proof of one act 'constitute[s][ ] or depend[s] upon proof of the other."  United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007) (quoting United States v. Halper, 590 F.2d 422, 429 (2d Cir. 1978)) (alterations in Shellef).  Similarly, where one offense stems from the other, that link "provides a sound basis for joinder under Rule 8(b)."  Turoff, 853 F.2d at 1044.  Finally, where two charged conspiracies are "intertwined" with each other, they are sufficiently related to justify joinder.  Attanasio, 870 F.2d at 815.

Rule 14 of the Federal Rules of Criminal Procedure provides, however, that even where joinder is proper under Rule 8(b), a court may nonetheless grant a severance "if the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the

19

government . . . ."  Fed. R. Crim. P. 14(a).  In order to prevail on a severance motion under Rule 14, a "defendant must show not simply some prejudice but <u>substantial</u> prejudice."  <u>United States v. Sampson</u>, 385 F.3d 183, 190 (2d Cir. 2004) (quoting <u>United States v. Werner</u>, 620 F.2d 920, 928 (2d Cir. 1980)) (emphasis in <u>Sampson</u>). A defendant seeking a severance under Rule 14 has an "extremely difficult burden," because he must demonstrate that he would be so prejudiced by joinder that he would be denied a fair trial.  <u>United States v. Casamento</u>, 887 F.2d 1141, 1149 (2d Cir.1989) (internal quotation marks and citation omitted).

It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[ ]."  <u>Zafiro v. United States</u>, 506 U.S. 534, 540 (1993).  Instead, "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of [a defendant], or prevent the jury from making a reliable judgment about guilt or innocence."  <u>Id.</u> at 539.  Even in those rare instances where a defendant establishes a "high" risk of prejudice, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice."  <u>Id.</u> (citing <u>Richardson v. Marsh</u>, 481 U.S. 200, 211 (1987)).

The Second Circuit has instructed that "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial."  <u>United States v. Rosa</u>, 11 F.3d 315, 341 (2d Cir. 1993).  "[T]he fact that evidence may be admissible against one defendant but not another does not require a severance," <u>United States v. Carson</u>, 702 F.2d 351, 367 (2d Cir. 1983), and a limiting instruction is typically sufficient to cure any potential for spillover prejudice.  <u>See</u> <u>United State v. DeVillio</u>, 983 F.2d 1185, 1192-93 (2d Cir. 1993) (court's "explicit limiting instruction to the jurors that testimony [concerning an attempted murder by co-defendants] could not be used as evidence against either [defendant pursuing

appeal]" was sufficient to protect against potential unfair prejudice arising from joint trial);

United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir. 1988) (holding that despite

defendants' claim that the "overwhelming majority of evidence introduced at trial was not

admissible against them," the trial judge's limiting instruction was sufficient to ensure that the

appealing defendants did not suffer unfair prejudice).

**C.**   **Application**

**1.**   **Whether the Obstruction Evidence Is Admissible Against Israilov**

Israilov contends that he will suffer unfair prejudice from "the additional counts

of obstruction of justice and false statements to law enforcement"; that evidence of obstruction

will be "offered by the [G]overnment to support its allegations on these obstruction-related

crimes"; and that "bias will . . . grow . . . if the [G]overnment blends testimony and other

evidence on these two obstruction counts with the underlying health care fraud scheme."

(Israilov Br. (Dkt. No. 149) at 20-21)  Israilov's severance arguments regarding prejudicial

spillover are misplaced, however, because the obstruction evidence is admissible against him

despite the fact that he is not charged in the obstruction counts.

The Second Circuit has instructed that "acts or statements designed to conceal an

ongoing conspiracy are in furtherance of that conspiracy."  United States v. Eisen, 974 F.2d 246,

269 n.8 (2d Cir. 1992).  Accordingly, evidence of "acts or statements designed to conceal" a

conspiracy is admissible not only where obstruction is charged, but also as evidence of the

charged conspiracy.  See United States v. Potamitis, 739 F.2d 784, 788 (2d Cir. 1984) ("The

evidence established a single conspiracy involving the robbery itself, obstruction of the

investigation, and various acts of concealment.  For example, it was essential to the plan that

Potamitis remain behind to play the 'victim,' to conceal his involvement in the crime and the

identity of his co-conspirators.  Potamitis's ruse enabled the others to flee and gave them time to

secrete the proceeds."); United States v. Mejia, 376 F. Supp. 2d 460, 463 (S.D.N.Y. 2005) ("A jury might reasonably infer from Mejia's attempt to conceal the $71,000 from U.S. Customs officials, along with evidence suggesting that those funds derived not from any legitimate business but from the drug conspiracy, that at least one of Mejia's purposes in attempting to unlawfully remove the funds was to conceal his participation in the activities that allegedly produced them. Therefore, evidence of the $71,000 is admissible as evidence of an act done in furtherance of the conspiracy.").

Here, the Indictment alleges that the charged healthcare fraud conspiracy and money laundering conspiracy continued through 2021. (Indictment (Dkt. No. 1) ¶¶ 40, 43) Indeed, the Indictment alleges that in April and June 2021, Defendants DiPietro and Gulkarov conducted a money laundering transaction: in April, DiPietro gave a co-conspirator "a check from the Wisnicki Firm," along with "a handwritten letter from . . . Gulkarov . . . which stated that [the co-conspirator] should deposit the money from the Wisnicki Firm, withdraw the funds, and give them to Gulkarov." In June 2021, the co-conspirator allegedly performed this transaction as directed. (Id. ¶¶ 36-37) The Government has also proffered that, "at trial, [it] intends to introduce evidence that Gulkarov and Israilov laundered money from the No-Fault Clinics' bank accounts through at least 2021, including by writing a check in January 2021 from one of the Clinics to the 'Jewish Institute of Queens.'" (Govt. Supp. Opp. (Dkt. No. 240) at 1)

Based on the Indictment and the Government's proffer, it appears that there will be evidence that the charged money laundering conspiracy was ongoing through 2021. And if the evidence demonstrates that these financial transactions were "efforts to secrete or launder moneys gained from" the healthcare fraud conspiracy, Milstein, 401 F.3d at 72, they will also demonstrate that the charged healthcare fraud conspiracy continued through 2021.

Accordingly, it does not appear that the healthcare fraud and money laundering conspiracies with which Israilov is charged had achieved their "main objective[s]" before 2021. Eisen, 974 F.2d at 269 n.8.  To the contrary, it appears that these conspiracies were ongoing in 2021, when the alleged obstruction occurred.  (Indictment (Dkt. No. 1) ¶¶ 33-39)  Accordingly, in the event that the Government's evidence demonstrates that the alleged obstructive conduct was in furtherance of the healthcare fraud and money laundering conspiracies, and was reasonably foreseeable to Israilov, the jury will be permitted to consider the obstruction evidence in determining whether Israilov is guilty of the conspiracy counts, despite the fact that Israilov did not himself engage in the obstruction conduct.  See Diaz, 176 F.3d at 99.  Moreover, there can be no risk of prejudicial spillover arising from the obstruction evidence where the obstruction evidence is admissible directly against Israilov, as proof of the charged healthcare fraud and money laundering conspiracies.  See United States v. McCoy, 58 F.4th 72, 75 (2d Cir. 2023) ("Here, primarily because the evidence for the reversed section 924(c) counts flows from the same facts and circumstances as the remaining counts, we . . . conclude that the Defendants have not suffered prejudicial spillover as a result of the now dismissed counts."); United States v. Hamilton, 334 F.3d 170, 185 (2d Cir. 2003) (no spillover prejudice from evidence of dismissed RICO count when "evidence of the conduct charged in three RICO predicate acts clearly overlapped the evidence of conduct alleged in the counts of conviction").

Citing Grunewald v. United States, 353 U.S. 391 (1957), however, Israilov argues that any obstructive conduct was not in furtherance of the charged healthcare fraud and money laundering conspiracies.  (Israilov Supp. Br. (Dkt. No. 236), passim)  In Grunewald, the Supreme Court held that "[p]ost-conspiracy acts of concealment do not, without more, extend the life of the conspiracy after its main objective has been attained."  Eisen, 974 F.2d at 269 n.8 (discussing

Grunewald); see Grunewald, 353 U.S. at 399-400 (rejecting Government's contention "that an agreement to conceal a conspiracy can . . . be deemed part of the conspiracy and can extend its duration for the purposes of the statute of limitations," because "'even after the central criminal objectives of a conspiracy have succeeded or failed, an implicit subsidiary phase of the conspiracy always survives, the phase which has concealment as its sole objective'") (quoting Krulewitch v. United States, 336 U.S. 440, 443 (1949)).

Relying on Grunewald, Israilov argues that "Wisnicki's charged lies to the grand jury (or any of the other co-defendants' alleged obstructive acts) . . . were . . . a separate effort to avoid detection and punishment after the main objectives [of the charged healthcare fraud and money laundering conspiracies] had been attained," and thus were not in furtherance of these conspiracies.  (Israilov Supp. Br. (Dkt. No. 236) at 6)  Israilov goes on to argue that

> the [G]overnment proffers no information or evidence that it alleges any acts in furtherance of the money laundering conspiracy after 2016 or 2017.  In the Indictment, this is the only time period referenced regarding the use of the Wisnicki law firm accounts.  (Indictment (Dkt. No. 25) ¶ 25(c) ("Between approximately 2016 and 2017, the Clinic Controllers made over $150,000 in payments to Wisnicki using the Pre-Signed Checks."))  And while the government had the opportunity to augment the allegations in the Indictment in its letter brief requested by the Court, it failed to do that.  Nothing in its latest submission includes any reference to acts alleged to have been committed in furtherance of the money laundering conspiracy involving the Wisnicki law firm after these checks were exchanged, and money transferred out, in 2016 and 2017.  In other words, the only information before the Court about alleged financial transactions engaged in furtherance of the money laundering conspiracy charged in Count Two are those completed nearly four years before the alleged perjury by Wisnicki before the grand jury.  These financial transactions comprise the objects of the money laundering conspiracy, not the statements by Wisnicki in 2021.  Extending the kidnapping analogy presented by the Supreme Court in Grunewald, these statements by Wisnicki are more akin to "covering the tracks" of kidnappers, than waiting for ransom payments.  Grunewald, 353 U.S. at 405 [("More closely analogous to our case would be conspiring kidnapers who cover their traces after the main conspiracy is finally ended – i.e., after they have abandoned the kidnaped person and then take care to escape detection.")].

(Id. at 6-7 (emphases in original))

This argument is unpersuasive.  As an initial matter, the failure of the Indictment to allege post-2017 overt acts in furtherance of the healthcare fraud and money laundering conspiracies is irrelevant, because the healthcare fraud and money laundering statutes do not require the Government to allege overt acts.  See United States v. Roy, 783 F.3d 418, 420 (2d Cir. 2015) ("[A] conspiracy conviction under [18 U.S.C.] § 1349 does not require proof of an overt act."); Whitfield v. United States, 543 U.S. 209, 219 (2005) ("[C]onviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy.")  In any event, as discussed above, Paragraphs 36 and 37 of the Indictment – which assert that Gulkarov and DiPietro orchestrated the return of the phony retainer fees to Gulkarov in April and June 2021 – allege conduct in furtherance of the charged money laundering conspiracy.  Moreover, the Government has proffered that it will offer evidence at trial of at least one 2021 money laundering transaction:  an incident in which Gulkarov and/or Israilov wrote "a check in January 2021 from one of the Clinics to the 'Jewish Institute of Queens.'"  (Govt. Supp. Opp. (Dkt. No. 240) at 1)

Because the Indictment and the Government's proffer indicate that the healthcare fraud and money laundering conspiracies continued into 2021, Grunewald is not applicable.

In sum, Israilov's severance motion fails, because the obstruction evidence about which he complains is admissible against him as direct evidence of the existence of the charged healthcare fraud and money laundering conspiracies.

## 2.    Whether there Is a Risk of Unfair Prejudice

Israilov argues that he will be unfairly prejudiced by introduction of the obstruction evidence at a joint trial, because this evidence suggests consciousness of guilt, which the jury will wrongly impute to him.  (Israilov Br. (Dkt. No. 149) at 20-21 ("[T]he [G]overnment will argue that the only reason for his co-defendants to falsify documents and intentionally

present fabricated evidence and testimony to the grand jury, or make false statements to

interviewing law enforcement agents was to conceal their criminality in the underlying health

care fraud scheme.  And since Mr. Israilov is charged with these co-defendants in that underlying

scheme, the jury will impermissibly infer that he also knew and intentionally joined the health

fraud conspiracy to accomplish its unlawful objectives.")))

   In the event that this Court were to conclude that the obstruction evidence is not

admissible against Israilov, the Court would instruct the jury that the obstruction evidence is not

to be considered as against Israilov.  "The 'law recognizes a strong presumption that juries

follow limiting instructions,'" United States v. Graham, 51 F.4th 67, 83 (2d Cir. 2022) (quoting

United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006)), including where juries are instructed

not to consider one defendant's statements against another defendant.  See Richardson, 481 U.S.

at 206 ("Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to

be a witness 'against' a defendant if the jury is instructed to consider that testimony only against

a codefendant.  This accords with the almost invariable assumption of the law that jurors follow

their instructions. . . ."); United States v. Reichberg, 5 F.4th 233, 244 (2d Cir. 2021) (no spillover

prejudice when defendant did not "rebut . . . presumption[] arising from the limiting instructions

[that] the jury . . . considered [a co-defendant's incriminating call] only as to [the co-defendant],

and not as to him"); Diaz, 176 F.3d at 103 ("[T]he district court gave limiting instructions to the

jury during the trial and in its final jury charges to assess the evidence against each defendant

separately from the evidence presented against other defendants. . . . [W]e find that the district

court did not abuse its discretion in denying [defendant's] severance motions.").  And nothing

about the obstruction evidence here suggests that a jury could not follow such an instruction.

See United States v. Stein, 428 F. Supp. 2d 138, 144 (S.D.N.Y. 2006) (rejecting spillover

prejudice argument concerning joint trial of obstruction and tax evasion counts, noting that

"these counts are not particularly inflammatory").

*    *    *    *

For all these reasons, Israilov's severance motion will be denied.[5]

---

[5]  In support of his severance motion, Israilov also contends that (1) to the extent the Government will offer as evidence statements that his co-defendants made to law enforcement, the introduction of such evidence would violate Israilov's rights under the Confrontation Clause, as set forth in Bruton v. United States, 391 U.S. 123 (1968) and Crawford v. Washington, 541 U.S. 36 (2004); and (2) this Court should order the Government to deliver "all of the Defendants' statements that it intends to introduce at a joint trial" for in camera inspection by the Court pursuant to Federal Rule of Criminal Procedure 14(b), or in the alternative to Defendants for a Bruton review.  (Israilov Br. (Dkt. No. 149) at 21-24)

At oral argument, the Government represented that it does not intend to offer any statements that present a Bruton/Crawford issue as to Israilov:

> MR. PELLEGRINO: . . . I actually think and I was going to suggest that what the Court might consider is a more limited – it wouldn't be a limiting instruction, but it would actually be a pretrial order in which any potential statements Mr. Wisnicki made in the grand jury about Mr. Israilov might just not be admitted.  I don't think there were many statements made by Mr. Wisnicki about Mr. Israilov specifically in the grand jury.
>
> Now, I would not be suggesting that any evidence of Mr. Israilov's involvement with Mr. Wisnicki should be set aside, but I am trying to avoid this proffered Bruton problem, essentially if there is a problem, by suggesting that on a pretrial motion basis we could supply what potential statements we might be intending to offer.  And in that regard, I think it can be decided on a pretrial motion basis and we just simply wouldn't offer those statements.
>
> . . . .
>
> As a side note, as I have said before, I don't think that Mr. Aronov's – I don't really think he comes into play here.  He is sort of a stand-alone piece.  I am not aware of any statements that he has regarding Mr. Israilov at this time.  If that were to change, again, we can address that on a pretrial basis.  The evidence may change.  As we have indicated, we have eight or more witnesses who might testify on this matter.  In meeting with them, there might be further development.  But in terms of the hard evidence, the written materials, the statements, I think there's limited utility in introducing whatever statements Mr. Wisnicki may have made to

the grand jury.  I think that would be the best way to handle that, and I think that would avoid any potential Crawford problem.

(Apr. 25, 2023 Tr. (Dkt. No. 221) at 44-45)

Israilov's lawyer responded:  "That might deal with issues relating to the confrontation clause or issues relating to Bruton-type issues."  (Id. at 47)

In light of this dialogue, the Court directs the Government to raise in its motions in limine the potential introduction of any statements that present an issue under Bruton and Crawford.  It appears likely that any such issue can be resolved between the parties.  If not, the Court will rule on the issue prior to trial.  In this regard, the Court notes that the Supreme Court has recently reaffirmed that Bruton and Crawford apply only to testimonial statements that directly refer to a defendant on trial, or that – although redacted – "obviously" refer to a defendant on trial.  See Samia v. United States, No. 22-196, 2023 WL 4139001, at *10 (U.S. June 23, 2023) ("[T]he District Court's admission of [appellant's co-defendant's] confession, accompanied by a limiting instruction, did not run afoul of this Court's precedents.  [The] confession was redacted to avoid naming [appellant], satisfying Bruton's rule.  And, it was not obviously redacted. . . ."); United States v. Lyle, 919 F.3d 716, 733-35 (2d Cir. 2019) (same).

Given the Government's representations that (1) it will not offer portions of Wisnicki's grand jury testimony referring to Israilov (see July 6, 2021 Wisnicki Grand Jury Tr. (Dkt. No. 227) at 42, 44-47, 61); (2) Aronov's statements to law enforcement do not reference Israilov; and (3) the Government will notify the Court and Israilov if it seeks to introduce any such statements referring to Israilov, the Court concludes that there is no Confrontation Clause issue warranting a severance of Israilov's trial, nor is there a basis for court review at this time.  As noted above, if any evidence presents a Bruton or Crawford issue, the Government will address this evidence in a motion in limine.

Defendant Gulkarov has joined Israilov's motion to "obtain a Court Order for the government to produce all defendants' statements that it intends to introduce at a joint trial."  (Nov. 1, 2022 Gulkarov Ltr. (Dkt. No. 156); Nov. 10, 2022 Order (Dkt. No. 164))  It appears that the Government may offer at trial – as evidence against Gulkarov – statements that Gulkarov's co-defendants made to law enforcement.  In United States v. Stewart, 433 F.3d 273 (2d Cir. 2006), however, the Second Circuit held that where co-defendants are charged with obstruction, there is no Confrontation Clause violation in admitting one defendant's "statements made in the course of and in furtherance of [d]efendants' conspiratorial plan to mislead investigators" against a co-defendant, even where the statements are truthful in part.  433 F.3d at 291-93.  Here, Gulkarov is charged with obstruction conspiracy.  (Indictment (Dkt. No. 1) ¶ 52)  Accordingly, Stewart is applicable.  There is no Confrontation Clause issue with respect to the admission against Gulkarov of co-defendants' obstructive statements, and therefore no basis for a court-ordered, pretrial review.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant Israilov's pretrial motions are denied.

The Clerk of Court is directed to terminate the motions (Dkt. No. 148).

Dated: New York, New York
         July 6, 2023

SO ORDERED.

Paul G. Gardephe
United States District Judge