UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>ROMAN ISRAILOV,<br>                              Defendant. | **MEMORANDUM<br>OPINION & ORDER**<br><br>22 Cr. 20 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

On November 1, 2023, Defendant Roman Israilov pled guilty to conspiracy to commit healthcare fraud and aggravated identity theft in connection with a long-running no-fault insurance fraud scheme. (Nov. 1, 2023 Plea Tr. (Dkt. No. 355)) On May 23, 2024, this Court sentenced Israilov to seven years' imprisonment and three years' supervised release, but deferred its determination as to restitution. (May 23, 2024 Sent. Tr. (Dkt. No. 486) at 50-51)

The Government now seeks an order requiring Israilov to make restitution to thirteen insurance companies in the aggregate amount of $46,651,801.04. The purpose of the proposed restitution order is to reimburse the insurers for payments they made to medical clinics that were controlled by non-physicians, including Israilov. Under New York law, insurance companies may deny reimbursement claims submitted by medical clinics that are controlled by non-physicians. See State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320-21 (2005).

Israilov opposes the Government's application. (See July 8, 2024 Def. Ltr. (Dkt. No. 531); July 30, 2024 Def. Ltr. (Dkt. No. 539))

For the reasons stated below, this Court will enter a restitution order in the aggregate amount of $46,651,801.04.

## BACKGROUND

I.  **THE INDICTMENT**

Israilov is charged in United States v. Gulkarov et al., 22 Cr. 20 (PGG), a large multi-defendant case premised on a $40 million no-fault insurance fraud scheme. The Indictment alleges that from approximately 2014 to 2021, Israilov and his co-defendants procured the identity of car accident victims through bribery, steered the accident victims to corrupt no-fault medical clinics willing to pay kickbacks for the referrals, and billed insurance companies for unnecessary medical procedures and medications. The corrupt medical clinics also falsely represented to the insurers that they were owned and controlled by physicians, when in fact they were not. (Indictment (Dkt. No. 1))

The Government alleges that Israilov was a "Clinic Controller," i.e., one of

> the leaders, organizers, and managers of the Gulkarov Organization and the No-Fault Scheme. The Clinic Controllers – who are not licensed medical practitioners – owned, operated, and controlled the No-Fault Clinics that engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No-Fault Law.

(Id. ¶ 8; see id. ¶ 15)

According to the Indictment, the non-physician Clinic Controllers decided what medical procedures the physicians associated with the clinics would perform and the medications that they would prescribe. Many of the procedures and medications prescribed were medically unnecessary, resulting in the overbilling of insurers. The Clinic Controllers also arranged for the physicians associated with the clinics to falsely represent to insurers that the clinics were physician-owned and physician-operated in order to obtain reimbursement on claims that would otherwise have been denied. (Id. ¶¶ 15-20)

## II.  ISRAILOV'S GUILTY PLEA AND SENTENCING

On November 1, 2023, Israilov pled guilty to conspiracy to commit healthcare fraud, in violation of 18 U.S.C. § 371, and to aggravated identity theft, in violation of 18 U.S.C. § 1028A. (Nov. 1, 2023 Plea Tr. (Dkt. No. 355) at 25-26)

In his plea agreement, Israilov stipulated to a Statement of Admitted Facts, which includes the following description of his criminal conduct:

> From at least in or about 2014 up to and including in or about 2021, the defendant agreed with others to unlawfully own and run clinics and pharmacies located in the New York area. The defendant knew that clinics are unable to bill insurance companies for No-Fault benefits if the medical facilities are controlled by non-physicians. The defendant nonetheless agreed with others to submit bills to insurance companies falsely representing that the clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations under Oath ("EUOs") about the ownership, control, and finances of the clinics and pharmacies. The defendant and his coconspirators unlawfully obtained from insurance companies at least $40,000,000 as part of the scheme.
>
> In connection with the scheme described above, the defendant and others also arranged for medical practitioners to prescribe unnecessary medical treatments (including MRIs, EMG/NCV testing, spinal injections, and computerized radiologic mensuration analysis), unnecessary durable medical equipment (including cervical home traction devices and lumbar back support), and medically unnecessary medications (including prescription strength painkillers, topical creams, and topical gels). The defendant and others further arranged for patients to receive medically unnecessary medications from pharmacies under the control of the defendant and others. The clinics also provided medically necessary treatments.

(Israilov Plea Agmt., Ex. B)

On May 23, 2024, this Court sentenced Israilov to seven years' imprisonment and three years' supervised release. (May. 23, 2024 Sent. Tr. (Dkt. No. 486) at 50) At Israilov's sentencing, this Court observed that

> [t]he clinics were not legally operated, and that was, among other things, because they were run by shadow operators, such as Mr. Israilov. . . . The doctors at the clinics did not actually operate the clinics, and they didn't function as real doctors because . . . for every patient, regardless of the patient's condition, regardless of

3

the injuries they had sustained, the doctors prescribed exactly the same treatments, treatments that Mr. Israilov and his coconspirators told the doctors to prescribe. The doctors also surrendered financial control of the clinics to Mr. Israilov and his fellow clinic controllers.

(Id. at 40-41)

## III. THE PARTIES' RESTITUTION SUBMISSIONS

At Israilov's sentencing, this Court deferred the determination of restitution for 60 days. (Id. at 50-51)

In a June 24, 2024 submission, the Government proposes a restitution order totaling $40 million, based on the reimbursement claims paid by eight insurance companies to the corrupt medical clinics controlled and operated by Israilov and his co-conspirators. (Dkt. No. 517)

In a July 8, 2024 letter, Israilov argues that the Government's proposed restitution amount of $40 million would "result in a windfall for the insurance companies," because it "fails to account for payments the insurance companies made to the clinics for necessary medical treatment." (July 8, 2024 Def. Ltr. (Dkt. No. 531) at 2) Israilov also argues that this Court should reduce his restitution liability to reflect his lesser culpability relative to co-defendants Alexander Gulkarov and Peter Khaimov. (Id. at 5-6)

On July 9, 2024, this Court deferred the restitution determination to August 21, 2024, and directed each insurance company victim seeking restitution to submit an affidavit or declaration providing a factual basis for the requested restitution amount. (Dkt. No. 532)

On July 19, 2024, the Government submitted a letter opposing Israilov's arguments regarding restitution. (Dkt. No. 534) On July 23, 2024, the Government submitted affidavits from a number of insurance companies supporting their claims for restitution. (Dkt. Nos. 536-537)

In a July 30, 2024 letter, Israilov repeats his argument that the restitution amount should be reduced to account for payments for medically necessary treatment. (July 30, 2024 Def. Ltr. (Dkt. No. 539) 1-5) Israilov also argues that his restitution amount should be reduced to reflect settlements that he entered into with certain insurers in related civil litigation. Finally, Israilov contends that certain insurers' requests for restitution are untimely under the Mandatory Victims Restitution Act. (Id. at 5-7).

On August 14, 2024, the Government filed a response to Israilov's July 30, 2024 letter (Dkt. No. 550), and on August 18, 2024, the Government submitted a proposed order of restitution for Israilov in the amount of $46,651,801.04.

In an August 20, 2024 letter, Israilov objects to any restitution amount over $40 million because (1) in his plea agreement the Government estimates the total loss at $40 million; and (2) in its initial June 24, 2024 letter addressing restitution the Government sought $40 million. Israilov also objects to language in the Government's proposed order of restitution directing that he make "monthly installment payments of at least twenty percent of [his] gross income." (Aug. 20, 2024 Def. Ltr. (Dkt. No. 552) at 1-2)

## DISCUSSION

### I. LEGAL STANDARD

The Mandatory Victims Restitution Act (the "MVRA") provides that when sentencing a defendant for an offense "in which an identifiable victim or victims has suffered a . . . pecuniary loss," the court "shall order, in addition to . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. §§ 3663A(a)(1), 3663A(c)(1)(B). The MVRA defines "victim" to include "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern

5

of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." Id. § 3663A(a)(2). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." Id. § 3664(f)(1)(A).

"The 'primary and overarching' goal of the MVRA is 'to make victims of crime whole, to fully compensate these victims for their losses[,] and to restore these victims to their original state of well-being.'" United States v. Qurashi, 634 F.3d 699, 703 (2d Cir. 2011) (quoting United States v. Boccagna, 450 F.3d 107, 115 (2d Cir. 2006)). "To fulfill this objective without 'award[ing] the victim a windfall, i.e., more in restitution than he actually lost,' the MVRA caps the restitution award at the actual 'amount of the victim's loss.'" United States v. Thompson, 792 F.3d 273, 277 (2d Cir. 2015) (quoting Boccagna, 450 F.3d at 117)). A victim's "actual" loss "equals 'the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned.'" Id. (quoting 18 U.S.C. § 3663A(b)(1)(B).

"Calculation of these losses need not be mathematically precise." United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016) (citation and quotation marks omitted). "[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable." United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013) (citation and quotation marks omitted).

## II. THE GOVERNMENT'S PROPOSED RESTITUTION ORDER

The Government seeks a restitution order amounting to $46,651,801.04. The Government argues that under New York's no-fault insurance law, medical clinics under the

6

control of non-physicians such as Israilov are not entitled to reimbursement from insurers for any medical claims, including for treatments and care that were medically necessary. (See July 19, 2024 Govt. Ltr. (Dkt. No. 534)) Accordingly, the insurers may seek restitution for any payments they made to medical clinics controlled and operated by Israilov and his co-conspirators. (Id.)

A. **The Fraudulent Incorporation Theory of Healthcare Fraud**

This Court addressed the Government's "fraudulent incorporation" theory of healthcare fraud in United States v. Pierre, No. 22 CR. 19 (PGG), 2023 WL 4493511, at *3 (S.D.N.Y. July 12, 2023). As this Court explained,

> [i]n 1973, the [New York] Legislature enacted the Comprehensive Automobile Insurance Reparations Act, which supplanted common-law tort actions for most victims of automobile accidents with a system of no-fault insurance. Under the no-fault system, payments of benefits "shall be made as the loss is incurred." N.Y. Ins. Law 5106(a). The primary aims of this new system were to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts, and to provide substantial premium savings to New York motorists.

Id. at *3 (quoting Med. Society of State of New York v. Serio, 100 N.Y.2d 854, 860 (2003)). After enactment of the no-fault insurance law, the New York Superintendent of Insurance issued anti-fraud regulations stating that "medical expenses incurred at medical clinics that are owned or operated by non-physicians are not considered 'medical expenses' or 'basic economic loss' within the meaning of the New York Insurance Law, and are thus outside the scope of no-fault insurance policies." Pierre, 2023 WL 4493511, at *5.

In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals upheld the New York Superintendent of Insurance's anti-fraud regulations and ruled that "fraudulently incorporated medical compan[ies]" – i.e., "companies [that] fail to meet the applicable state licensing requirements, which prohibit nonphysicians from owning or controlling medical service corporations" – are "not entitled to reimbursement" under New

7

York's no-fault insurance law, even for claims that reflect "appropriate care from a health professional qualified to give that care." Id. at 320-21. As this Court observed in Pierre, "Mallela . . . teaches that where a medical clinic misrepresents to an insurer that it is owned or controlled by a physician in order to obtain payment for medical services, the clinic defrauds the insurer." Pierre, 2023 WL 4493511, at *7.

Since Mallela, courts in this Circuit have consistently acknowledged that the "fraudulent incorporation" theory utilized by the Government here provides a basis for a healthcare fraud conviction under 18 U.S.C. § 1347. In United States v. Zemlyansky, 945 F. Supp. 2d 438 (S.D.N.Y. 2013), for example, Judge Oetken denied a motion to dismiss where the Government's healthcare fraud charges were premised on a fraudulent incorporation theory. In so ruling, Judge Oetken reasoned that

> [a] misstatement about a [medical clinic's] ownership, if made with the intent to deceive the insurer into making payment it would otherwise withhold, is a misstatement made with the intent to cause injury to the insurer. Whether properly characterized as a "windfall" or not, the insurer's entitlement to withhold reimbursement in these circumstances is an interest in money or property, the deprivation of which can be an injury under the fraud statutes. . . .
>
> The fact that Mallela was a civil case is simply beside the point, as New York law, as construed by the New York Court of Appeals in Mallela, does not create the substantive federal offenses at issue. Rather, the Court here looks to New York law simply to determine whether a material misrepresentation has been made and whether it was made with the intent to defraud. On those issues, Mallela is crystal clear.

Id. at 448-49.

Zemlyansky's co-defendant, physician Tatyana Gabinskaya, was subsequently convicted at trial of healthcare fraud and conspiracy to commit healthcare fraud. On appeal, the Second Circuit found the evidence sufficient to sustain her convictions:

> The evidence adduced at trial was sufficient for a rational jury to find Gabinskaya's knowing and willful participation in the scheme as the straw owner of [the] Clearview [medical clinic]. As discussed above, Gabinskaya signed the

8

> necessary paperwork in order for her coconspirators to open and operate Clearview, but did not exercise any control over its operations, or participate in its business or medical decisions. Gabinskaya did not see patients or supervise employees. Rather, the clinic was controlled and operated solely by [non-physicians] Zemlyansky and Danilovich. Nor did Gabinskaya fund Clearview's operations or share in the profits or the risk of loss, instead receiving a fixed payment of $1,500 per week.
>
> Gabinskaya's knowledge of the fraudulent nature of the scheme was also sufficiently proved. Most tellingly, Gabinskaya falsely testified during [an examination under oath conducted by an insurance company] that she worked at the clinic two to three times per week, supervised employees, and interviewed patients, including Adelaida Martinez, testimony which was directly contradicted by other evidence admitted at trial. Such false testimony permits a reasonable jury to infer consciousness of wrongdoing. Gabinskaya's perjurious statements were all designed to portray Gabinskaya as involved in or controlling Clearview's operations, as is necessary under New York State law. The jury was entitled to conclude from Gabinskaya's false testimony during the [examination under oath], along with the totality of the evidence, that Gabinskaya understood that, in order for Clearview lawfully to submit no-fault insurance claims, she, as a licensed physician, had to be not merely its paper owner but rather its actual owner, and that she knowingly participated in the fraudulent scheme with the intent to further its aims by misrepresenting her role at Clearview. Gabinskaya's challenge to the sufficiency of the evidence therefore fails.

United States v. Gabinskaya, 829 F.3d 127, 132 (2d Cir. 2016).

Likewise in Pierre, this Court rejected a motion to dismiss filed by Israilov and several of his co-defendants, in which they argued that federal healthcare fraud charges could not be premised on a fraudulent incorporation theory. This Court observed that,

> [w]hile this case arises in the statutory context of New York's no-fault insurance law, it presents straightforward allegations of insurance fraud – i.e., intentional misrepresentations to insurers about whether claims are for covered loss, in order to obtain payments that would otherwise be denied. The Indictments thus adequately allege "a scheme or artifice to defraud a[ ] health care benefit program, or to obtain by means of false or fraudulent pretenses, representations, or promises, . . . money or property owned by, or under the custody or control of, a[ ] health care benefit program." 18 U.S.C. § 1347(a) (formatting altered).

Pierre, 2023 WL 4493511, at *11.

Under this precedent, the corrupt medical clinics under the control of Israilov and his non-physician co-defendants were not entitled to reimbursement from insurers for any

9

medical care or treatment they rendered to accident victims. Accordingly, the insurers that paid such reimbursement to these corrupt medical clinics may seek restitution for the amounts they paid.

B.  **The Restitution Amounts Sought by the Insurers**

The Government's seeks a restitution order in the aggregate amount of $46,651,801.04. The following insurers have submitted affidavits or declarations stating that they made payments to medical clinics controlled by Israilov and his co-conspirators, in the listed amounts:

- Farmers Insurance Exchange: $888,765.20 (July 23, 2024 Govt. Ltr., Ex. A (Farmers Victim Impact Statement) (Dkt. No. 536-1) ¶ 7);

- State Farm Automobile Insurance Company: $8,598,629.81 (id., Ex. B (Constanzo Decl.) (Dkt. No. 536-2) at 7);

- New York Central Mutual Fire Insurance Company: $295,556.66 (id., Ex. C (Winston Aff.) (Dkt. No. 536-3) at 1);

- Nationwide Mutual Insurance Company: $1,019,700.49 (id., Ex. D (Cook Aff.) (Dkt. No. 536-4) at 1);

- Liberty Mutual Insurance Company: $1,010,495.15 (id., Ex. E (Beadle Aff.) (Dkt. No. 536-5) ¶ 5);

- Government Employees Insurance Company: $14,607,524.83 (id., Ex. F (Asmus Decl., Ex. 1) (Dkt. No. 536-6) at 3);

- United Services Automobile Association: $1,422,103.16 (id., Ex. G (Caster Decl.) (Dkt. No. 537-1) ¶ 15);

- Allstate Insurance Company: $11,936,282.45 (id., Ex. H (Flaherty Aff.) (Dkt. No. 537-2) ¶ 15);

- Connect Insurance Company: $36,283.45 (id., Ex. I (Baker Aff.) (Dkt. No. 537-3) ¶ 4);

- Country-Wide Insurance Company: $5,742,743.97 (id., Ex. J (Filacouris Aff.) (Dkt. No. 537-4) ¶ 13);

- Plymouth Rock Management Company of New Jersey: $134,954.54 (id., Ex. K (Stevens Aff.) (Dkt. No. 537-5) ¶ 11);

- Plymouth Rock Assurance Corporation: $65,509.39 (id., Ex. L (Miller Aff.) (Dkt. No. 537-6) ¶ 12);

- National General Insurance: $893,252.94 (July 23, 2024 Schroeder Aff. ¶ 7)

These thirteen insurers paid a total of $46,651,801.04 to the corrupt clinics controlled by Israilov and his co-conspirators – a sum equal to the amount sought in the Government's proposed restitution order.

Israilov does not dispute that the insurers made the payments that they say they made. Nor does Israilov dispute that the insurers made these payments to clinics that he and his co-conspirators controlled.

### III. ISRAILOV'S OBJECTIONS TO THE GOVERNMENT'S PROPOSED RESTITUTION ORDER

Israilov contends that the restitution amount should be lowered "to account for payments the insurance companies made to the clinics for necessary medical treatment." (July 8, 2024 Def. Ltr. (Dkt. No. 531) at 2) In this regard, Israilov notes that the Statement of Admitted Facts entered at the time of his guilty plea acknowledges that – in addition to the unnecessary treatments, procedures, and medications that his clinics prescribed – "[t]he clinics . . . provided medically necessary treatments." (Israilov Plea Agmt., Ex. B)

> Consistent with this stipulation, independent physicians, acupuncturists, and chiropractors hired by the insurance companies: (1) performed independent medical examinations of many relevant patients, (2) confirmed the patients' injuries, and (3) prepared reports stating that physical therapy, chiropractic, and acupuncture treatments provided to these patients were "reasonable and necessary" to treat their injuries. Some of the reports went further yet and recommended additional forms of treatment consistent with those medical findings.

(July 8, 2024 Def. Ltr. (Dkt. No. 531) at 2) (citations omitted)

11

Israilov also cites case law holding that, "'in health care-fraud cases, an insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud.'" (Id. at 3) (quoting United States v. Sharma, 703 F.3d 318, 324 (5th Cir. 2012)); see also United States v. Mahmood, 820 F.3d 177, 195 (5th Cir. 2016) ("[A]n insurance organization[] receives 'value' when its beneficiaries receive legitimate health care services for which [it is] is obligated to pay but for a fraud."); United States v. Klein, 543 F.3d 206, 213-15 (5th Cir. 2008) (reducing insurers' loss "by the value of the drugs dispensed" to patients where "the patients needed those drugs and . . . the insurers would have had to pay for the drugs"); United States v. Vivit, 214 F.3d 908, 915 (7th Cir. 2000) (calculating "the amount of loss suffered by the insurers by netting the total costs submitted by [defendant], minus the legitimate medical services that he provided"); United States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007) ("Even though . . . Medicare would not pay a claim if they knew parties were receiving kickbacks, this is not sufficient to establish a loss to Medicare. . . . Medicare pays out a fixed amount for every type of claim.  Therefore, evidence that shows that [defendants] paid kickbacks from a fixed level of profits is not sufficient to show actual or intended loss to Medicare.").

Citing this authority, Israilov contends that because – absent the fraudulent incorporation – the insurers would have been obligated to pay reimbursement claims for medically necessary treatments, the restitution award should be reduced for costs associated with medically necessary treatments.  (See July 30, 2024 Def. Ltr. (Dkt. No. 539) at 3)

As an initial matter, Israilov does not specify the amount of costs associated with "medically necessary treatments."  Given that the doctors at Israilov's clinics did not exercise their own independent judgment as to the treatments, procedures, and medications that would be

12

prescribed, but instead – "for every patient, regardless of the patient's condition, regardless of the injuries they had sustained, . . . prescribed exactly the same treatments, treatments that Mr. Israilov and his coconspirators told the doctors to prescribe" (May 23, 2024 Sent. Tr. (Dkt. No. 486) at 40) – any medically necessary treatment that was rendered at Israilov's clinics would have been accidental. And because the purpose of Israilov's clinics was not to provide necessary healthcare to patients but rather to generate revenue from insurance companies, there is no reason to believe that the cost of the medically necessary treatments that were accidentally rendered to patients would appreciably affect the restitution amount.

Moreover, none of the cases cited by Israilov address the type of fraud scheme at issue here. In pleading guilty to conspiracy to commit healthcare fraud, Israilov admitted that he

> agreed with others to unlawfully own and run clinics and pharmacies located in the New York area. The defendant knew that clinics are unable to bill insurance companies for No-Fault benefits if the medical facilities are controlled by non-physicians. The defendant nonetheless agreed with others to submit bills to insurance companies falsely representing that the clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations under Oath ('EUOs') about the ownership, control, and finances of the clinics and pharmacies. The defendant and his coconspirators unlawfully obtained from insurance companies at least $40,000,000 as part of the scheme.

(Israilov Plea Agmt., Ex. B) In other words, Israilov admitted at the time of his guilty plea that he knew that none of the medical clinics he and his co-conspirators controlled were allowed to bill insurers for the medical care they provided to accident victims.

Under Mallela, claims reflecting "appropriate care from a health professional qualified to give that care" are "not entitled to reimbursement" under New York's no-fault insurance law when those claims are submitted by "fraudulently incorporated medical compan[ies]." Mallela, 4 N.Y.3d at 320-21. Accordingly, absent Israilov's fraudulent representations that his clinics were controlled and operated by physicians, the insurers would

13

have provided no reimbursement for the medical care they rendered. There is thus "[no] amount that the insurer would have paid had the defendant not committed the fraud." Sharma, 703 F.3d at 324.

In sum, Israilov is not entitled to a reduction in his restitution amount because some of the care provided at his clinics might have coincidentally been medically necessary.

Israilov next argues that the restitution award against him should be reduced to reflect his culpability relative to that of his co-defendants:

> Mr. Israilov should not be held responsible for the maximum possible amount of restitution as he was neither the innovator nor the ultimate leader of the conspiracy. See May 23, 2024 Sent. Trans. at 40-41 (discussing Mr. Israilov's explanation about joining the already operational clinics and remaining employed by them even after learning (albeit "quickly") the clinics were not actually operated by the physicians in violation of state law). Mr. Israilov likewise did not reap the most benefit from the crime. The Court recognized at sentencing that Mr. Israilov "only received $5 million of the fraud proceeds," which totaled $40 million. Id. at 42-43. Two codefendants in Mr. Israilov's case each made more than three times that amount according to the government's sentencing memorandums. Compare Gov't Sent. Memo. at 11, ECF 491 (co-defendant "pocketed approximately $17.5 million in illegal proceeds over the course of the scheme"); id. at 16 (co-defendant "has made tens of millions of dollars from overlapping healthcare fraud schemes spanning nearly a decade"); Gov't Sent. Memo. at 15, ECF 503 (co-defendant "is accountable for approximately $17.5 million in illegal proceeds over the course of the scheme").
>
> These and other differences between Mr. Israilov and his co-defendants prompted the government to characterize Mr. Israilov as "significantly less culpable than the leaders of the scheme, Gulkarov and Khaimov." Gov't Sent. Memo. at 11, ECF 477 (emphasis added); see also id. at 2 ("Israilov is the third-ranking member of the Gulkarov conspiracy. Gulkarov and Khaimov were co-leaders of the conspiracy"). A principled approach to restitution would account for this relative culpability, rather than arbitrarily assigning equivalent liability to Mr. Israilov and his codefendants despite their disparate economic gains from the crime, or levels of contribution to the insurance companies' losses.

(July 8, 2024 Def. Ltr. (Dkt. No. 531) at 5-6) (footnote omitted)

This Court addressed Israilov's culpability at his May 23, 2024 sentencing:

> Once Mr. Israilov learned what was really going on at the clinics, and that would have been pretty quick, he had a decision to make. As he explains it, he had no

14

> choice because he owed $250,000 in private loans and $120,000 in credit card debt. He says, for these reasons, he had to continue with the insurance fraud scheme. He explains that, "the welfare of his family is what motivated him to continue in this role." But as is often the case in crimes of this sort, the truth is more complicated. It wasn't simply about paying off debts. As the years passed, the family moved into a $2.5 million home and began driving around in a $140,000 Mercedes Benz, and Mr. Israilov accumulated $70,000 in jewelry.
>
> The defendant's crimes were the product of countless bad decisions made over a period of seven years. The patients who went to the defendant's clinics assumed that the doctors who were there were prescribing the treatments that the doctors believed were medically necessary rather than treatments they had been directed to prescribe by Mr. Israilov and the other clinic controllers. In that sense, the trust of the patients was abused.
>
> Mr. Israilov's crimes were not the product of impulse, but instead reflect careful thought [and] planning. And the defendant and his coconspirators took countless steps to protect their fraudulent scheme from detection, including the laundering of the fraud proceeds and the creation of shell companies.
>
> The loss to the insurance was enormous, $40 million, and the proceeds of the fraud that the defendant received, $5 million, were substantial.
>
> I believe that Mr. Israilov is sincerely remorseful, and that if he could go back, he would make different decisions. So I'm not worried about specific deterrence here, but there is a compelling need for general deterrence. This was an incredibly lucrative scheme. Those contemplating the type of long-running insurance fraud scheme seen here, a scheme that is extremely difficult to detect and that imposes a hidden tax on everyone who pays for insurance must be deterred. Such people must understand that the consequences of committing such crimes, if they are detected, will be extremely severe.

(May 23, 2023 Sent. Tr. (Dkt. No. 486) at 41-42)

        Acknowledging that Israilov did not conceive the no-fault insurance fraud scheme, he was a central actor in it and one of the primary beneficiaries. He controlled and operated a number of the corrupt clinics; he directed the clinics' doctors to prescribe the medically unnecessary treatments, procedures, and medications; and he received $5 million in the fraud proceeds. And he committed his healthcare fraud offenses day-in and day-out for seven years. While he was not the most culpable defendant in the fraud scheme, his culpability is not so minimal that he should be excused from his statutory obligation to make restitution to

15

the insurers he victimized.  This is particularly true given that "[t]he 'primary and overarching' goal of the MVRA is 'to make victims of crime whole, to fully compensate these victims for their losses[,] and to restore these victims to their original state of well-being.'"  Qurashi, 634 F.3d at 703 (quoting Boccagna, 450 F.3d at 115).

        Israilov also argues that his restitution amount should be reduced "to account for civil litigation settlements" between himself and various insurance companies.  (July 30, 2024 Def. Ltr. (Dkt. No. 539) at 5)  While Israilov cites court filings that appear to reference settlement agreements between himself and certain insurers that seek restitution here (see id.), he has not provided any details concerning these settlements.  For example, Israilov has not offered evidence that he made settlement payments in any of these cases, much less the amount of any such payment.  It is also not clear that the settlements referenced in the court filings relate to the same conduct at issue in this case.  In sum, Israilov has not provided sufficient information concerning these settlements to justify reducing the restitution amounts sought by the insurers.

        Israilov next contends that the restitution requests made by several insurers are untimely, because the Government first provided notice of these insurers' restitution requests after Israilov's sentencing.  (July 30, 2024 Def. Ltr. (Dkt. No. 539) at 6)  Israilov cites 18 U.S.C. § 3664(d)(1) in support of this argument.  Section 3664(d)(1) provides that, "[u]pon the request of the probation officer, but not later than 60 days prior to the date initially set for sentencing, the attorney for the Government, after consulting, to the extent practicable, with all identified victims, shall promptly provide the probation officer with a listing of the amounts subject to restitution."  18 U.S.C. § 3664(d)(1).

        Section 3664(d)(1) also provides, however, that

> [i]f the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so

16

inform the court, and the court shall set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing.

18 U.S.C. § 3664(d)(5). Here, the Government informed the Court at Israilov's sentencing that it was still calculating the restitution amounts for certain insurer victims, and this Court deferred the restitution determination for 60 days. (May 23, 2023 Sent. Tr. (Dkt. No. 486) at 45, 51) This Court later extended that deadline to 90 days after Israilov's sentencing. (Dkt. No. 532) The Government notified Defendants of the insurers' restitution requests on June 24, 2024 (Dkt. No. 517), and again on July 23, 2024. (Dkt. No. 536).

Israilov has cited no case law suggesting that – given these circumstances – it is improper for this Court to consider all of the insurers' restitution requests.

In a letter submitted today, Israilov argues that any order of restitution entered by the Court should be capped at $40 million because (1) in his plea agreement the Government estimated the total loss at $40 million; and (2) the Government's initial June 24, 2024 submission concerning restitution sought $40 million. (Aug. 20, 2024 Def. Ltr. (Dkt. No. 552) at 1)

The plea agreement language referenced by Israilov states that "[t]he defendant and his coconspirators unlawfully obtained from insurance companies at least $40,000,000 as a part of the scheme." (Israilov Plea Agmt., Ex. B) This language refers to the loss as "at least" $40 million and, in any event, does not address a restitution award. Moreover, nothing in the plea agreement purports to bind the Government to seek any particular restitution amount. Indeed, the agreement provides that "[it] is further understood that the defendant shall make restitution in an amount to be specified by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664." (Id. at 2)

17

As to the Government's June 24, 2024 letter, that submission was made before the Government had collected all of the necessary affidavits and declarations from the victimized insurers, in which they documented total losses of $46,651,801.04.

In any event, this Court has an independent obligation under the MVRA to calculate a restitution amount that will "fully compensate . . . victims for their losses[.]" Qurashi, 634 F.3d at 703 (citation and quotation marks omitted).

In sum, there is no basis for limiting the order of restitution to $40 million when the victimized insurers have offered proof that their losses total $46,651,801.04.

Finally, Israilov requests that any order of restitution require monthly payments of less than twenty percent of his gross monthly income. (Aug. 20, 2024 Def. Ltr. (Dkt. No. 552) at 2)  In determining a payment schedule, this Court must consider "the financial resources and other assets of the defendant[,]" "projected earnings and other income of the defendant[,]" and "any financial obligations of the defendant[,] including obligations to dependents."  18 U.S.C. § 3664(f)(2).  In this regard, Israilov states that he will "likely return to work as a barber after imprisonment," and will "need to support his wife and three children."  Given these circumstances, Israilov contends that installment payments amounting to twenty percent of his monthly gross income would be excessive.  (Aug. 20, 2024 Def. Ltr. (Dkt. No. 552) at 2)

In light of Israilov's likely future employment and his family obligations, this Court's restitution order will provide for monthly installment payments amounting to fifteen percent of his gross monthly income.

## **CONCLUSION**

For the reasons stated above, this Court will enter an order of restitution in the aggregate amount of $46,651,801.04.

Dated: New York, New York
       August 20, 2024

                                                 SO ORDERED.

                                           _____
                                           Paul G. Gardephe
                                           United States District Judge